UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| W. DUMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-01665-JPH-MPB |
| | ) | |
| PAUL TALBOT, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
DIRECTING ENTRY OF FINAL JUDGMENT**

Willie Dumes, an inmate at Pendleton Correctional Facility, alleges in this civil rights lawsuit that Dr. Paul Talbot and Wexford of Indiana, LLC were deliberately indifferent to severe pain in his back, left leg, and left hip. The defendants have filed a motion for summary judgment. Dkt. [27]. For the reasons below that motion is granted.

**I. Facts and Background**

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

Mr. Dumes has been incarcerated at Pendleton since 2010 or 2011, with the exception of two years he spent at Wabash Valley Correctional Facility. Dkt. 29-3 at 3 (Dumes Dep. at 7:2–9). He underwent back surgery in October of 2016 but did not get relief from the operation. Dkt. 42-1 at 3, ¶ 4. Mr. Dumes attests that he saw a doctor in 2017 who told him that he would need another

surgery.[1] *Id.* ¶ 5. That doctor also recommended a nerve block for temporary relief. *Id.* Mr. Dumes received the nerve block but did not feel relief.[2] Dkt. 29-1 at 10.

Mr. Dumes was transferred from Wabash Valley to Pendleton in July of 2019. Dkt. 29-2 ¶ 5. At that time, he had been approved to use a cane for his back pain, and physical therapy had been recommended for his back pain. Dkt. 29-1 at 1–2; 7–12. Shortly after his arrival at Pendleton, Mr. Dumes met with Nurse Practitioner Elaine Purdue. *Id.* at 5–6. Mr. Dumes told her that he had been taking Neurontin and using a cane. *Id.* Nurse Purdue informed him of the limitations with Neurontin at Pendleton and told him an assessment would be performed. *Id.* She recommended a short course of Tylenol until the assessment. *Id.* Mr. Dumes was provided with a bottom bunk pass. *Id.*

Mr. Dumes saw Dr. Talbot on July 17, 2019. *Id.* at 7–12. Before the appointment, Dr. Talbot reviewed email correspondence from Mr. Dumes's previous medical care providers. Dkt. 29-2 ¶ 7. Those emails indicated that Mr. Dumes's previous back surgery had failed and recommended that he receive onsite physical therapy at a facility that could accommodate that therapy. Dkt. 29-1 at 7–12. Dr. Talbot noted that Mr. Dumes was able to get on and off the exam table and walk normally with the assistance of the cane, *id.*, but Mr. Dumes asserts that getting on and off of the table was painful and that he suffered pain while working at his prison job, dkt. 42-1 at 4, ¶ 11. Dr. Talbot referred Mr. Dumes for physical therapy, ordered a pass for Mr. Dumes to use the handicap shower, and continued his Neurontin prescription. Dkt. 29-1 at 7–12. Mr. Dumes

---

[1] The medical record Mr. Dumes designates regarding this consultation does not contain a recommendation for further surgery. Dkt. 42-1 at 1.

[2] Mr. Dumes also attests that he was scheduled to follow-up with the doctor who performed the nerve block, but there is no record of this follow-up in the record. Dkt. 42-1 at 3–4, ¶ 5.

contends that when he asked Dr. Talbot about surgery, Dr. Talbot told him he was not going to spend Wexford's money on the surgery. Dkt. 42-1 at 4, ¶ 7.

Mr. Dumes had his first visit with the onsite physical therapist a few days later. Dkt. 29-1 at 14–15. He was educated on how to use his cane to provide maximum benefit for his pain. *Id.* The physical therapist also showed him flexibility exercises and planned to follow-up with him in two weeks. *Id.* Mr. Dumes continued to receive physical therapy through August 2019. *Id.* at 16–23. During the fourth session, Mr. Dumes needed little direction as he performed the exercises, and the physical therapist encouraged him to continue the exercises once or twice per day. *Id.* at 22. No further physical therapy sessions were requested. *Id.* Mr. Dumes asserts that the physical therapy did not relieve his pain. Dkt. 42-1 at 8, ¶ 8.

Mr. Dumes saw Nurse Purdue on September 12, 2019. Dkt. 29-1 at 25–30. He was able to perform full flexion with moderate discomfort. *Id.* at 29. She noted that he walked with a cane, but "kind of carries the cane rather than using it to walk." *Id.* at 28. Mr. Dumes asserts that using the cane caused him more pain while walking and that compensating for his back pain caused his neck pain. Dkt. 42-1 at 5, ¶ 12. Nurse Purdue ordered an x-ray of Mr. Dumes's neck and submitted a request for him to receive additional physical therapy for the pain in his neck. Dkt. 29-1 at 30. Mr. Dumes saw Nurse Purdue again two weeks later to discuss his neck pain. *Id.* at 31–33. She reviewed Mr. Dumes's x-ray, which showed no cervical abnormality of the spine. *Id.* She advised Mr. Dumes to follow-up with medical as needed and re-submitted her request for additional physical therapy. *Id.*

In October 2019, Mr. Dumes began physical therapy for his neck pain, where he was educated on new gentle range of motion exercises. *Id.* at 34–35. Mr. Dumes was also placed in

cervical traction and was placed on the nursing staff's treatment list to come to the medical department four times per week for 30 days for cervical traction exercises. *Id.*

Mr. Dumes was seen by a nurse on October 9, 2019, complaining that he was still having pain in his lower back and down his left leg and asking to be sent to an outside hospital. Dkt. 29-1 at 36–39. He was referred to meet with an onsite provider for an evaluation and was provided with ice and cool compresses. *Id.* Dr. Talbot saw Mr. Dumes two days later. *Id.* at 40–42. Dr. Talbot noted that Mr. Dumes's gait remained normal, and it appeared he was carrying his cane when he walked, rather than using it for support. *Id.* Based on Mr. Dumes's report that Tylenol and Aspirin did not help relieve pain, Dr. Talbot ordered Mobic for two weeks and explained that it should be taken with Pepcid. *Id.*

Mr. Dumes continued to undergo physical therapy for his neck pain through October 2019. *Id.* at 43–47.

Mr. Dumes saw Dr. Talbot on November 6, 2019, and requested to see a surgeon about his back pain. *Id.* at 48–50. Dr. Talbot noted that Mr. Dumes could work on his feet in the kitchen, *id.*, but Mr. Dumes asserts that it was painful for him to work in the kitchen, dkt. 42-1 at 9, ¶ 14. His activities of daily living were normal. Dkt. 29-1 at 48–50. Dr. Talbot provided him a plan for back exercises and gave him Tylenol for pain relief. *Id.* Dr. Talbot did not believe there was a clinical indication for Mr. Dumes to meet with a general surgeon because there were no physical signs that surgery was required. *Id.*

Dr. Talbot left Pendleton in November 2019 and did not see Mr. Dumes again after the November 6 appointment. Dkt. 29-2 ¶ 18.

## II. Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

### III. Analysis

To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

> [C]onduct is "deliberately indifferent" when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff "was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so."

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 F. App'x 861, 862

5

(7th Cir. 2015) (holding that doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

### A. Dr. Talbot

It's undisputed that Mr. Dumes had a serious medical condition. Dr. Talbot argues that he was not deliberately indifferent to those needs.

When Mr. Dumes arrived at Pendleton in 2019, he had recently undergone an unsuccessful back surgery. Dkt. 42-1 at 3, ¶ 4. He was transferred to Pendleton so that he could receive onsite physical therapy. Dkt. 29-1 at 7–12. Dr. Talbot referred Mr. Dumes for that physical therapy, ordered a pass for Mr. Dumes to use the handicap shower, and continued his Neurontin prescription. *Id.* Mr. Dumes underwent several weeks of physical therapy but asserts that the therapy did not relieve his pain. Dkt. 29-1 at 22; dkt. 42-1 at 4, ¶ 8. When Mr. Dumes next saw Dr. Talbot, Dr. Talbot noted that Mr. Dumes was not using his cane for support and prescribed Mobic to address his pain. Dkt. 29-1 at 40–42. The next, and last, time Dr. Talbot saw Mr. Dumes, Mr. Dumes asked for a referral to a surgeon, but Dr. Talbot did not believe there was a clinical indication for the referral. *Id.* at 43–47. Dr. Talbot provided a plan for back exercises and Tylenol for pain. *Id.*

The designated evidence shows that Dr. Talbot evaluated Mr. Dumes's condition and attempted to address both the underlying condition and the corresponding pain. Mr. Dumes asserts that an outside doctor told him that he needed another back surgery, but the records that Dr. Talbot reviewed upon Mr. Dumes's transfer to Pendleton indicate that another surgery was not recommended. Dkt. 29-1 at 7–12. And even if Mr. Dumes's outside doctor had recommended additional surgery, Mr. Dumes has not designated evidence showing that Dr. Talbot knew of such recommendation. Additionally, after evaluating Mr. Dumes and his condition, Dr. Talbot determined that a surgical referral was not necessary. While Mr. Dumes disputes Dr. Talbot's evaluation of his pain—asserting that he did have pain climbing on and off of the exam table and working on the kitchen—it is undisputed that Dr. Talbot considered Mr. Dumes's complaints and treated his pain with physical therapy and different medications. Mr. Dumes's disagreement with the specific course of treatment that Dr. Talbot selected does not show deliberate indifference. *Pyles*, 771 F.3d at 409. Based on these facts, no reasonable jury could conclude that Dr. Talbot was deliberately indifferent to Mr. Dumes's back pain. *See Johnson v. Dominguez*, 5 F.4th 818, 825 (2021) ("When a plaintiff's claim focuses on a medical professional's treatment decision, 'the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'") (quoting *Norfleet*, 439 F.3d at 396).

### B. Wexford

Although a private entity, Wexford acts under color of state law and therefore may be liable for damages under § 1983 under *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91 (1978). *Walker v. Wexford Health Sources*, 940 F.3d 954, 966 (7th Cir. 2019). "Prevailing on such a claim requires evidence that a Wexford policy, practice, or custom caused" the constitutional violation alleged. *Id.* Wexford "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of

*respondeat superior* for constitutional violations committed by [its] employees. [It] can, however, be held liable for unconstitutional … policies or customs." *Simpson v. Brown County*, 860 F.3d 1001, 1005–06 (7th Cir. 2017) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690–91 (1978)).

Mr. Dumes has designated no evidence showing that any alleged deliberate indifference to his pain was the result of a policy, practice, or custom on Wexford's part. The only evidence Mr. Dumes designates regarding Wexford is his allegation that Dr. Talbot told him he did not want to spend Wexford's money. But this evidence does not demonstrate that Dr. Talbot was acting pursuant to a Wexford policy, rather than making a personal decision. Nor does this single instance provide evidence of a widespread practice or custom of denying necessary surgical care to save money. *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014) ("[I]solated incidents do not add up to a pattern of bad behavior that would support an inference of a custom or policy."); *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (holding that four incidents over 11 months involving only the plaintiff was insufficient to show a widespread practice or custom). Therefore, no reasonable jury could find on these facts that any harm Mr. Dumes suffered was the result of a Wexford policy, practice, or custom.

### IV. Conclusion

For the reasons discussed above, the defendants' motion for summary judgment, dkt. [27], is **GRANTED**. Final judgment consistent with this ruling shall now issue.

**SO ORDERED.**

Date: 3/14/2022

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

W. DUMES
905144
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Rachel D. Johnson
KATZ  KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com